**SOLAR SALT COMPANY, Plaintiff and Appellant,**

**v.**

**SOUTHERN PACIFIC TRANSPORTATION COMPANY, a corporation, Defendant and Respondent.**

No. 14427.

Supreme Court of Utah.

Sept. 10, 1976.

Frank J. Allen, of Clyde & Pratt, Salt Lake City, for plaintiff and appellant.

Haldor T. Benson and James R. Amschler, of VanCott, Bagley, Cornwall & McCarthy, Salt Lake City, for defendant and respondent.

ELLETT, Justice:

The plaintiff has a lease from the State of Utah on land bordering the shore of the Great Salt Lake which it uses in connection with the extraction and production of salt from the waters of the lake. It also has a royalty agreement whereby it is obligated to pay ten cents to the State of Utah for each ton of salt shipped, used, sold or consumed by it. Furthermore, the lease includes a right to appropriate water from the lake for the purpose of extracting the salt contained therein by means of solar evaporation.

There is no guarantee as to the amount of salt which is in, or will be in, the water diverted. Under normal conditions the percentage will vary according to the amount of water in the lake. This variance depends upon the amount of water which flows into the lake and to the amount of evaporation therefrom.

The plaintiff does not own the salt in the water until it has been transported to

its leased land;[1] and it does not have an exclusive right to extract any salt from the lake.

The rights of salt companies operating under leases such as the one plaintiff has, were clearly set out in the case of *Morton International, Inc. v. Southern Pacific Transportation Co.*[2]

The defendant railroad company constructed a causeway across the lake, leaving about one third of the surface of the lake separated from the two thirds from which this plaintiff obtains its water. As a result of the construction of the causeway, the water in the south two thirds of the lake is approximately 20 inches higher than that in the northern one third. The State of Utah required the defendant to construct two openings through the causeway, and since some 90 per cent of the water entering the lake does so from the south, the southern portion has less salt than does the northern portion. The plaintiff, therefore, has to evaporate more water in order to obtain the same amount of salt than it otherwise would have to do.

This action was filed seeking damages from the defendant for losses claimed to be sustained by reason of the construction and maintenance of the causeway.

▮ The plaintiff here seeks to distinguish its case from that of the *Morton* case (supra, footnote 2) on the basis that this action is predicated upon a public nuisance. It claims that the north part of the lake is polluted by having that which it desires in the south part, to-wit: more salt. It claims that a small animalcule (brine shrimp) cannot survive and flourish in the northern part now and that certain algae will not live in the more briny part of the lake.

Plaintiff's interest in brine shrimp is nil. Its interest is in salt and salt alone. The fact that some algae die and other algae thrive in different parts of the lake gives no cause for damages to the plaintiff who is nearly one hundred miles removed therefrom.

The fact of the matter is that the plaintiff has no protected legal right at all in and to the salt in the waters of the lake and, therefore, cannot recover under any theory for damages occasioned by reason of a diminution of the salt content of the lessor's water.[3]

In the *Morton International, Inc. v. Southern Pacific Transportation Co.* case (supra, footnote 2), which is identical to the instant case, we said at page 259, 495 P.2d at page 33:

The State owning the salt and plaintiff having but a nonexclusive right to extract and process it, the basic question remains as to whether construction of the railroad's causeway, which concededly diluted the water of its salt content in the so-called South Lake, created a compensable claim against the railroad in favor of plaintiff, concededly damaged in the sense that dilution of the water it diverts will cost more in the salt reduction process. We think there is no compensable claim here because plaintiff has no exclusive right against the State or others to the salt or the water from which it is converted, . . . .

▮ The appellant relies on part of Section 73–14–2(a), U.C.A.1953, (L.U.1953, Ch. 41 Sec. 2). It states:

"Pollution" means such contamination, or other alteration of the physical, chemical or biological properties, of any waters of the state, . . . as will create a nuisance or render such waters harmful or detrimental or injurious to . . . industrial . . . uses . . . .

1. 65–1–15, U.C.A.1953 as amended.

2. 27 Utah 2d 256, 495 P.2d 31 (1972), cert. den. 409 U.S. 934.

3. *Hardy Salt Company v. Southern Pacific Transportation Co.*, 501 F.2d 1156 (10th Cir. 1974).

In order for this statute to apply in this case it would be necessary for the defendant to alter the physical property of the water of the lake so as to create a *nuisance* or to render the water *harmful*, or *detrimental*, or *injurious* to the salt extracting processes used by the plaintiff. Nothing here is harmful, detrimental, or injurious to the extraction of salt. All that is done by lowering the salt content is to require the sun to evaporate more water in order to obtain a given amount of salt. The statute says nothing about it being a nuisance if salt is removed from water. If it meant that when the salt content of water was lowered a public nuisance would result, then it is obvious that the Solar Salt Company itself is guilty of a public nuisance, for it is also removing salt from the lake and thus leaving less salt for its competitors.

Professor Prosser states the following:

To be considered public, the nuisance must affect an interest common to the general public, rather than peculiar to one individual, or several.[4]

We are unable to see a public nuisance in this matter, and we think the case of *Morton International, Inc. v. Southern Pacific Transportation* (supra, footnote 2) is squarely in point and should be dispositive of the present appeal insofar as any diminution of salt in the water of the lake is concerned.

The judgment of the trial court is affirmed, with costs awarded to the respondent.

HENRIOD, C. J., concurs.

CROCKETT, Justice (concurring):

The only difference I can see between this case and the case of *Morton International, Inc. v. Southern Pacific,* cited in the main opinion, is that plaintiff Solar here makes the contention that the defendant's construction of the causeway has created a nuisance under Section 73-14-2(a), U.C.A.1953, which defines pollution:

"Pollution" means such contamination, or other alteration of the physical, chemical or biological properties, of any waters of the state, . . . as will create a nuisance or render such waters harmful or detrimental or injurious to . . . industrial . . . uses . . . .

The correct interpretation and application of that statute can best be defined by reading it in its total context and in the light of its purpose. Under the familiar rule of statutory construction known as noscitur a sociis, it should be assumed words used together are intended to be of similar meaning; and under the rule of ejusdem generis general terms are deemed to mean things of the same character as the specific terms.[1]

If the statute is read in that light, I do not believe that a diminution of salt content could reasonably be regarded as either "pollution," or as a harmful, detrimental, or injurious contamination; and therefore the general words "or other alteration" should be deemed to mean something of the same character as the particular terms just stated. I therefore think the trial court correctly rejected plaintiff's complaint.

This further comment seems to be justified, supplementing that made in the *Morton Salt* case, in regard to possible rectification of this unfortunate situation. This is particularly so in the light of the representation that there are so many millions of dollars worth of minerals recoverable from this lake. If the two 50-foot openings in the causeway are not adequate to permit sufficient free flow and interchange

4. Law of Torts, p. 606.

1. See *Hatch v. Pub. Serv. Comm.,* 3 Utah 2d 7, 277 P.2d 809, 812; *Anderson v. Utah County,* 13 Utah 2d 99, 368 P.2d 912; 2 Sutherland, Statutory Construction (3d Ed.) 393, 395.

between the north-south portions of the lake, perhaps with some cooperation and forbearance between the various mineral-producing lessees and the Railroad Company, and the State Land Board, some feasible plan could be worked out to construct additional openings in the causeway, with trestles over them, to eliminate or at least minimize this difficulty, in order to achieve the greatest possible benefit to all parties concerned, including the State of Utah and its people, from the resources of the Great Salt Lake.

MAUGHAN, Justice (dissenting):

The ruling on appeal is a summary judgment, which says plaintiff cannot recover damages from defendant for causing and maintaining a condition which constitutes a public nuisance; and which injures plaintiff. We should reverse.

Section 73–14–2(a), U.C.A.1953, defines "pollution" as including an alteration of the physical, chemical or biological properties of any waters of the state, which renders such waters harmful, detrimental or injurious, to a commercial or industrial use. Any action causing "pollution" as defined in the foregoing section is deemed a public nuisance, Section 73–14–5(a), U.C.A.1953. Reading this statute in its entirety leaves no room for a resort to statutory construction, because there is no ambiguity in its terms.

The fact that plaintiff has merely a license, to divert the waters of the Great Salt Lake and extract the salt, with no ownership interest in the saline solution does not resolve the issue involved herein. Plaintiff seeks injunctive relief and damages on the ground that defendant maintains a public nuisance as declared by the legislature. We are required to draw the distinction, between an action for a public nuisance, and one for a private nuisance. The Restatement of Torts clarifies that distinction:

A private action may, however, arise out of a public nuisance, and such must be distinguished from private nuisance. An individual cannot maintain an action for a public nuisance as such. But when an individual suffers special damage from a public nuisance, he may maintain an action. This action for special damages arising out of the maintenance of a public nuisance is often confused with the action for private nuisance. The latter action has traditionally been restricted to invasions of interests in the use and enjoyment of land, and while a possessor of land is allowed to recover incidental damages for harms to his person or chattels in an action for private nuisance, the action is not available for the protection of those interests to a person who has no property rights or privileges in land. In cases where special damage has resulted from a public nuisance, invasions of interests of private persons other than interests in the use and enjoyment of land are actionable.[1]

In *Lewis v. Pingree National Bank*[2] this court stated the rule was well established, that private persons may not invoke the aid of the courts to abate public nuisances, unless they can show they suffer some special or peculiar injury, which is not common to the rest of the community. The court explained:

. . . While private individuals, therefore, may not champion purely public rights, yet where an individual suffers some injury or damage through a public nuisance, which is different from that suffered by the community at large, he ordinarily may invoke the aid of the courts of justice, not only to redress the injury or damage suffered by him, but he may also ask to have the nuisance removed or abated. In order to permit an individual to resort to the courts, the extent of the injury or damage, ordinarily, is not material, so long as it is clearly

1. Restatement, Torts, Chap. 40, pp. 217–218.   2. 47 Utah 35, 42, 151 P. 558, 561 (1915).

shown that the plaintiff suffers some substantial injury or damage which is not suffered by the community at large. By substantial injury is meant that "it must be of a substantial character, not fleeting or evanescent" [Citations]. . . .

In *Riggins v. District Court of Salt Lake City*[3] this court cited the general rule: An individual may bring an action concerning a public nuisance; only when he can show he has sustained damage, of a special character, distinct and different from the injury suffered by the public generally. This court expressed the view a private corporation may, by injunction, prevent the commission of any act which is without just cause or excuse, and which destroys its custom and profit.

> The right to protect one's financial interests is not confined to rights arising from contracts.

A plaintiff, having a special financial interest, has standing to maintain an action for abatement.

Illustrations of what "particular damage" is sufficient to support a private action for a public nuisance are of long standing.

> Pecuniary loss to the plaintiff has been regarded as different in kind when the defendant's obstruction has prevented the plaintiff from performing a particular contract, as for example to transport goods over the highway in question, or when it has put him to additional expense, or expensive delay, in performing it. It has also been considered sufficient where the plaintiff has an established business making a commercial use of the public right with which the defendant interferes, as where a river is blocked and plaintiff operates a steamboat line or rafts logs, or collects tolls for passage. There are several cases in which commercial fisheries making a localized use of public waters have been allowed to recover for pollution, where the ordinary citizen deprived of his occasional piscatorial Sunday pleasure could not do so . . . .[4]

Plaintiff's license to divert and extract salt from the state's water is analogous to a commercial fisherman's license, and the cases involving a fisherman's private action for a public nuisance, pollution, are applicable to the instant action. In *Columbia River Fishermen's Protective Union v. City of St. Helens*[5] the court described the plaintiffs, as gill net fishermen, who have a special interest, distinct from the public in fishing their drift, and such will be protected in a court of equity against destruction by acts of the defendants. The defendants were paper and pulp mills which discharged pollutants into the rivers. The defendant had successfully urged before the trial court plaintiffs could not maintain the suit, because they had suffered no special and peculiar injury differing in kind from that suffered by the public. The court responded:

> There is a vital distinction between the rights of plaintiffs, who are accustomed to fishing in the river and have a license so to do, and the rights of other citizens of the state, who never fish in the river and do not intend to and are interested only in a general way in the benefit the state receives by the prosecution of a valuable industry, so that surely the plaintiffs have a special interest differing widely from the interest of the public in fishing in the portions of the river mentioned.[6]

3. 89 Utah 183, 220–221, 51 P.2d 645, 662 (1935).

4. Prosser, Law of Torts (4th Ed.), § 88, pp. 590–591.

5. 160 Or. 654, 87 P.2d 195 (1939).

6. at p. 197 of 87 P.2d.

The court recognized the ownership of the fish (as the salt in the instant action), before they were taken, to be in the State of Oregon. It explained the purpose of the action was not to obtain the fish, but to protect the right of fishermen to pursue their vocation of fishing. Thus, one, who is exercising his right to take fish from a common fishery, and is obstructed by a public nuisance, may abate the obstruction. The court held the privilege or right of plaintiffs, to fish, was distinguishable from the right of the public; and plaintiffs had sustained a special and material injury, by being deprived of the privilege of fishing, in the stream where they had a license to do so. Thus, they had standing to maintain their action.

In *Hampton v. North Carolina Pulp Co.,*[7] plaintiff filed an action for damages to his fishery and business on the Roanoke River, caused by defendant discharging pollutants—a public nuisance. The court stated:

> The law will not permit a substantial injury to the person or property of another by nuisance, though public and indictable, to go without individual redress, whether the right of action be referred to the existence of a special damage, or to an invasion of a more particular and more important personal right. The personal right involved here is the security of an established business. The fact that plaintiff had such established business antedating the nuisance, and that the injury had been done to this, takes him out of the rule and makes his damage special and peculiar. [Citations].[8]

Defendant urged plaintiff had no interest in the migration of the fish, which would give him a right of action for wrongful interference or diversion; because plaintiff had no property in the fish until they were captured. The court responded that plaintiff did not claim any property right in the fish, but did claim the right to have the migration continued uninterruptedly to his nets; without the wrongful interference of the defendant. It further observed that the convenient access, which plaintiff had from his property to the run of the fish, was an advantage of which he could not be lawfully deprived; by the alleged nuisance.

> . . . It is true that he might obtain access to the fish by going to more distant points where the nuisance had not yet affected the fish, if there were such places, but "if a man's time and money are worth anything," he has received a substantial damage in being driven to this necessity.[9]

This statement is applicable to the matter at hand—for it is asserted plaintiff could go to the north end of the lake to divert the water.

In *Carson v. Hercules Powder Company*[10] it was held that defendant, by polluting the water, had prevented the operation of plaintiff's commercial fishing business; and, therefore, defendant became directly liable to plaintiff for any damage to his business and loss of profits.

In the instant action, plaintiff alleged defendant had created a condition, which the legislature had deemed a public nuisance. The trial court, evidently, granted defendant's motion for summary judgment on the ground defendant had no property right in the salinity of the solution in the lake. However, a plaintiff's action for damages for a public nuisance is not dependent on his establishing an interference with his use and enjoyment of his real property.[11] Plaintiff is entitled to maintain

7. 223 N.C. 535, 27 S.E.2d 538 (1943).

8. at pp. 545–546 of 27 S.E.2d.

9. p. 546 of 27 S.E.2d.

10. 240 Ark. 887, 402 S.W.2d 640 (1966).

11. *Raymond v. Southern Pacific Company,* 259 Or. 629, 488 P.2d 460 (1961) ; *Culwell v. Abbott Construction Co., Inc.,* 211 Kan. 359, 506 P.2d 1191 (1973).

its action for a public nuisance, if it can establish a special or peculiar injury or damage, which is not common to the rest of the community. Such an injury has been alleged, viz., plaintiff has an established business making commercial use of a public right, with which defendant has interfered. Plaintiff is entitled to a trial on the merits.

TUCKETT, J., concurs in the views expressed in the dissenting opinion of Mr. Justice Maughan.